

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00318-CV

———————————————

MARISA SCOTT, Appellant

V.

DEMARROW WOOLEY, Appellee

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court No. 19-5637-442

Before Gabriel, Kerr, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

The trial court denied Appellant Marisa Scott's application for a protective order against Appellee Demarrow Wooley. In three issues, she challenges the trial court's allowing Wooley to make a blanket invocation of his Fifth Amendment right against self-incrimination, the court's including in its order a finding that no family violence had been committed, and the court's denial of her application. We affirm.

## BACKGROUND

Scott filed an application for a protective order and ex parte temporary protective order seeking protection from Wooley for herself, her unborn child, and her mother, father, and brother. *See* Tex. Fam. Code Ann. § 82.001. According to Scott's application, she met Wooley at the restaurant where she worked—and where Wooley was her superior—when she was nineteen years' old and Wooley was approximately fifty-two. Scott's application alleged that she had been raped by Wooley and that she became pregnant as a result. She asserted that their relationship qualified as a dating relationship under Texas Family Code Section 71.0021(b), *see* Tex. Fam. Code Ann. § 71.0021(b); that Wooley had engaged in conduct constituting family violence; and that she reasonably feared that there was "a clear and present danger of family violence."

The trial court granted Scott's requested temporary ex parte protective order and set the matter for a hearing. The only two witnesses at the hearing were Scott and

her mother. Scott called Wooley to testify, but he invoked his Fifth Amendment right against self-incrimination, which the trial court sustained.

After Scott rested her case, Wooley moved for a directed verdict,[1] which the trial court granted. The trial court subsequently signed an order denying Scott's application. The order included a finding that family violence had not occurred and was not likely to occur in the future. Scott now appeals.

## DISCUSSION

### I.    Wooley's Fifth Amendment Invocation

In her first issue, Scott asserts that the trial court's allowing Wooley to make a blanket invocation of his Fifth Amendment right against self-incrimination impermissibly denied her the right to question Wooley. Scott is correct that in a civil proceeding, a party or witness invoking the privilege against self-incrimination may not make a blanket assertion of the privilege and refuse to take the witness stand. *In re Nichol*, 602 S.W.3d 595, 601 (Tex. App.—El Paso 2019, orig. proceeding).[2] However,

---

[1]Because there was no jury, this motion should have been labeled a motion for judgment. *See Grounds v. Tolar I.S.D.*, 856 S.W.2d 417, 422 n.4 (Tex. 1993) (Gonzalez, J., concurring).

[2]Instead, "the witness must assert the privilege on a question-by-question basis," *Nichol*, 602 S.W.3d at 601, and the trial court is entitled to determine whether each assertion "appears to be based upon the good faith of the witness and is justifiable under all of the circumstances." *In re Speer*, 965 S.W.2d 41, 45 (Tex. App.—Fort Worth 1998, orig. proceeding). Further, unlike in a criminal case, a factfinder may make negative inferences from a party's assertion of the privilege. *Id.* at 46; *see* Tex. R. Evid. 513(c).

Scott did not preserve her complaint for appeal. When Scott called Wooley to testify, Wooley's attorney informed the trial court that he had instructed Wooley to invoke "his Fifth Amendment right to remain silent" because Scott had accused him of a felony. Scott's attorney stated that he "ha[d] no problem with that" on the condition that Wooley not take the stand in rebuttal. Although Scott's attorney then pointed out to the trial court that Wooley had no criminal charges pending against him, in case "that ma[de] a difference" to the trial court's ruling, at no point did he complain that Wooley had no right to make a blanket assertion of the privilege or that Wooley instead needed to take the stand and invoke the privilege on a question-by-question basis.[3] Accordingly, he did not preserve his complaint for appeal. *See In re R.V., Jr.*,

---

[3]The entirety of the discussion was as follows:

[Appellee's attorney]: I've instructed my client to invoke his Fifth Amendment right to remain silent because she has accused—even now, her lawyer is still accusing him of rape here in this courtroom. The Constitution does not permit them to call him to testify.

*THE COURT*: Okay.

[Appellant's attorney]: I—if he doesn't want to testify today, doesn't want to take the stand, then we'll go off of just my client's testimony. I have no problem with that, Your Honor.

But I will ask that he can't call him as a rebuttal—agree to stipulate that he's not going to take the stand at all.

*THE COURT*: Well, I think he gets to make that decision after you present your case.

4

977 S.W.2d 777, 780 (Tex. App.—Fort Worth 1998, no pet.) (holding appellant had not preserved complaint that he had (correctly) not been allowed to make a blanket invocation of the privilege because he did not object when the trial judge and parties discussed how to handle a different witness's invocation and the trial court ruled that she would take the stand and each attorney would lodge objections to the questions asked).

## II. Finding of No Family Violence

Scott argues in her second issue that the trial court reversibly erred by including in its order a finding that Wooley had not committed family violence. She contends that the only ground for Wooley's motion for judgment was that she had not proven that Wooley was likely to commit family violence in the future, that neither party moved for a ruling on the issue of past family violence, and that the trial court never

---

[Appellant's attorney]: I don't get to cross him—or I can't call him directly?

*THE COURT*: You can't call him directly, but you will absolutely get the opportunity to cross him if he decides to put him on the stand.

[Appellant's attorney]: There also are no criminal charges pending, Your Honor. It's only an allegation, if that makes a difference. I don't know if that changes the analogy here, but he's claiming that he's not subject to it. There's been no charges filed against him.

*THE COURT*: Well, but the allegations were rape. I mean, that's what your allegations were in your opening statement. And so in an abundance of caution, I'm going to allow him—or not allow you to call him in your case-in-chief.

ruled on the issue. She also argues that the only evidence on this issue was her testimony that Wooley had committed past family violence.

Before issuing a protective order, the trial court would have had to find both that Wooley had committed family violence in the past *and* that he was likely to do so in the future.[4] *See* Tex. Fam. Code Ann. § 85.001(b); *In re J.A.T.*, No. 13-04-00477-CV, 2005 WL 1981497, at *1 (Tex. App.—Corpus Christi–Edinburg Aug. 18, 2005, no pet.) (mem. op.); *cf. Laufer v. Gordon*, No. 14-18-00744-CV, 2019 WL 6210200, at *1 (Tex. App.—Houston [14th Dist.] Nov. 21, 2019, no pet.) (mem. op.). Accordingly, if Scott did not meet her burden to show a likelihood of future family violence, the trial court could grant Wooley's motion for judgment on that basis without a need to first find that Wooley had not committed past family violence. However, the trial court *was* required to make a finding on that question at the close of the hearing. Tex. Fam. Code Ann. § 85.001(a). The trial court did not explicitly make such a finding at the hearing,[5] but it included the finding in its order. Scott has

---

[4]Scott's application did not allege that Wooley had violated a previous, since-expired protective order while that order was in effect. *See* Tex. Fam. Code Ann. § 85.002 (allowing entry of a protective order without the findings under § 85.001 if the respondent violated a previous protective order). Scott also did not seek a protective order under Texas Code of Criminal Procedure Article 7A.03, which permits the issuance of a protective order based on the commission of certain acts, including sexual assault and stalking, and which does not require the applicant to have a reasonable fear of future harm. *See* Tex. Code Crim. Proc. Ann. art. 7A.03; *R.M. v. Swearingen*, 510 S.W.3d 630, 633 n.2 (Tex. App.—El Paso 2016, no pet.).

[5]The San Antonio Court of Appeals has held that while the trial court must make the findings required by Section 85.001 at the close of the hearing, "no part of

6

not explained how she was harmed by the fact that the trial court made the statutorily required finding in its order without first stating it at the hearing, and she has cited no authority for that proposition.[6] *See* Tex. R. App. P. 38.1, 44.1; *cf. Watts v. Adviento*, No. 02-17-00424-CV, 2019 WL 1388534, at *8 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (per curiam) (mem. op.) (conducting harm analysis in reviewing admission of evidence supporting trial court's issuance of a protective order).

Scott also argues that "this finding conflicts with the trial court's rendering of judgment at the close of the hearing." Scott does not explain this argument; as Scott recognizes, the trial court did not expressly rule on that issue at the hearing—and thus the later written finding does not conflict with an earlier oral finding—and the finding supports rather than contradicts the trial court's determination at the hearing that Scott was not entitled to a protective order.

Scott further argues that "[t]here is no statutory authority upon which the trial court can rest this finding." Scott does not further expound on this argument, *see* Tex. R. App. P. 38.1, but we read this sentence to argue that because the trial court had not

_____

[that section] requires those findings to be express." *See In re M.I.W.*, No. 04-17-00207-CV, 2018 WL 1831678, at *2 (Tex. App.—San Antonio Apr. 18, 2018, no pet.) (mem. op.). The Houston First Court of Appeals, on the other hand, has stated (in a case not directly addressing the question) that the trial court must make explicit findings at the close of the hearing. *Taylor v. Taylor*, 608 S.W.3d 265, 268 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

[6]For example, Scott has not suggested that this finding would prevent her from seeking a protective order in the future based on new acts by Wooley.

explicitly made a finding of no past family violence at the hearing, it had no authority to make that finding in its order. By statute, the trial court was required to make a finding on the issue at the close of the hearing. Scott presents us with no case law or other authority to support her argument that the court was barred from including in its order a finding that it was required to make (even if not requested to do so by the parties) unless it first stated the finding at the hearing, *see id.*, and, regardless, as we have stated, Scott has not shown harm.

Finally, Scott argues that the evidence does not support the finding. As we have held that Scott did not show harm from the finding, we would not be required to reverse the order even if the evidence did not support the finding. *See* Tex. R. App. P. 44.1. We overrule Scott's second issue.

### III.   Denial of Protective Order

In her third issue, Scott challenges the factual sufficiency of the evidence supporting the trial court's order, arguing that the denial of her application is so contrary to the overwhelming weight of all relevant evidence as to be clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (setting out the factual sufficiency standard of review). In reviewing evidence for factual sufficiency, we consider and weigh all of the evidence, and, in an appeal from a bench trial, we defer to the trial court's credibility determinations. *S-G Owners Ass'n, Inc. v. Sifuentes*, 562 S.W.3d 614, 620 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see also*

8

*Luna v. Pickel*, No. 02-19-00371-CV, 2020 WL 5949927, at *6 (Tex. App.—Fort Worth Oct. 8, 2020, no pet. h.) (mem. op.).

## A.    Relevant Statutes and the Evidence at Trial

The statutory definition of "family violence" includes "dating violence," which is defined as

> an act, other than a defensive measure to protect oneself, by an actor that:
>
>    (1) is committed against a victim or applicant for a protective order . . . with whom the actor has or has had a dating relationship . . . and
>
>    (2) is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the victim or applicant in fear of imminent physical harm, bodily injury, assault, or sexual assault.

Tex. Fam. Code Ann. §§ 71.0021, .004.

The only evidence presented at the hearing was the testimony of Scott and her mother. In her testimony, Scott explained the basis of her rape allegation against Wooley and her fear of future violence from him. She first testified about her state of mind during that time period, acknowledging that she had previously had a drug problem but asserting that she stayed off drugs for over a year after working through a drug program. However, in early January 2019, her brother went missing from the Navy and disappeared for several weeks, and the stress of the situation and of trying to find him led Scott to "get back into drugs." Scott described herself as being "kind of in a hopeless place" at that point, not caring whether she lived or died. Around that

9

time, after much badgering from Wooley, she went on several dates with him. On those dates, despite her being underage, he would buy her alcoholic drinks and gave her ecstasy and marijuana.

In February, Scott went to Wooley's apartment because he told her that he was having a Super Bowl party, that some of her coworkers were attending, and that she needed to be there, but when she arrived, she was the only person there. She had taken an "upper" before going but it brought on a panic attack, so she took a Xanax (witnessed by Wooley) to calm down once she arrived at his apartment, which resulted in her falling asleep. When she woke up, "[her] pants were on the floor" and "he was on top of [her]." She managed to leave the apartment despite Wooley's attempts to stop her and her cutting her foot on a nail by the door. She called her Narcotics Anonymous sponsor and told him what happened, and he encouraged her to report the incident to the police. She did not report the incident, however, because she was afraid of what Wooley would do if he found out, and because she had experience with reporting a previous sexual assault, and she felt "like [she's] not ever believed whenever [she] do[es] say anything." She also told friends from her NA group what happened.

She later moved in with Wooley for several weeks because he threatened that, thanks to an uncle "who [was] really high up in the Navy," he could ruin her brother's career; "made multiple threats on [her] dad in particular"; and told her "that if [her] parents were out of the way, then [she] would have no choice but to move in with

10

him." She stated that he told her that he had killed someone before and that if she ever left him, he would have to kill her as well and "that if he ever does go in and, like, try to kill this one person, he'll take out the entire family, including children, so there are no witnesses." She stated that, despite his threats against her and her family, she moved out once she realized that she was pregnant. She further stated that she has not used drugs since around that time. After she moved out, Wooley sent her text messages asking her to come back; she told him to stop texting her, but he "would not leave [her] alone no matter what," and he told her that he was going to kill himself. She further stated that she reported his texts to their employer, and he was fired soon after.

Scott's mother testified that Scott "has had a very rough life." Scott's parents adopted her and her brother from a Russian orphanage when Scott was six months old. She had a cleft palate, and before she had surgery to correct the issue, she was bullied by other children. Scott's mother stated that Scott always tried to handle problems herself rather than to seek help from others "because she didn't want to hurt anybody." She acknowledged that Scott has a past history of drug use and lying, but she said "[t]hat's no longer [Scott's] history."

With respect to grounds for the protective order, she testified that she is "fearful" that she could be harmed. She explained that this fear is based on text messages she has seen from Wooley to Scott; she has never met Wooley, and he never made any threats directly to her or to her husband. She did not say what the texts said,

11

but she stated that the texts contained no direct threats but were threatening by implication.

Copies of the texts mentioned by Scott and her mother were not admitted at trial. However, Scott attached screenshots of texts to her protective order application, and the trial court stated at the hearing that it had considered the contents of its file. The text messages stated,

> You've made the biggest change in ur lifestyle. Allow and let me do the same.
>
> I have nothing then without you two.
>
> I'll see how fast I can kill myself
>
> No I don't need anything it's just how I feel without you. Yes I do actually love the hell out of you I made mistakes but I'm ready to be the man I am and give you the best life I can. I fucked up and I never want to put you threw [sic] bullshit again.
>
> Happy Easter . . . . been getting my ass kicked
>
> Call me when you have a chance
>
> one thing I hate more than anything haven't nobody congratulated me for having a baby
>
> I just wanted to say I'm sorry for being a asshole with you And I made you feel rejected or taken advantage of and unimportant that wasn't my intentions I'm going to make more of an effort in considering your feelings, to make sure it never happens again I'm also going to stop and think before and I talk and stop drinking as you suggested. Again I'm sorry! I humbly ask for your forgiveness I hope my mistake won't

prevent you from trusting me in the future I hope you'll forgive me for making you feel uncomfortable.[7]

## B. The Trial Court's Order is Not Against the Great Weight of the Evidence

The trial court apparently disbelieved, at the least, Scott's testimony that Wooley made threats of future violence.[8] The trial court, as the factfinder, was the sole judge of Scott's credibility and the weight to be given to her testimony, *see Watts*, 2019 WL 1388534, at *6, and the trial court was free to reject part or all of her testimony. *See Pena v. Garza*, 61 S.W.3d 529, 532 (Tex. App.—San Antonio 2001, no pet.).

The only other witness, Scott's mother, had no direct contact with Wooley. She based her fear of him on the text messages shown to her by Scott, messages that she acknowledged contained no direct threats.

---

[7]The record does not show the date on which the first four texts were sent, but the remaining texts were sent on April 21, 27, and 29, 2019, and on May 21, 2019, respectively.

[8]The trial court's finding of no past family violence indicates that it did not believe Scott's testimony that Wooley had raped her. However, even if it had believed that allegation, the trial court could have granted Wooley's motion for judgment. While a finding that Wooley committed past violence could support a finding of a likelihood of future violence, *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) (recognizing that evidence a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future), *disapproved of on other grounds by Iliff v. Iliff*, 339 S.W.3d 74 (Tex. 2011), it would not have required the trial court to make a future-violence finding in the absence of other evidence of that likelihood. *See J.A.T.*, 2005 WL 1981497, at *1.

Finally, the text messages do not require reversal. Certainly, if Scott wanted no contact with Wooley, receiving these texts would have caused her discomfort, and in the texts Wooley admitted to making Scott uncomfortable. However, the texts contain no threats to Scott or her family. *Contra Kuzbary v. Kuzbary*, No. 01-14-00457-CV, 2015 WL 1735493, at *1, *2 (Tex. App.—Houston [1st Dist.] Apr. 14, 2015, no pet.) (mem. op.) (upholding protective order when, among other behaviors, a father sent his daughter emails stating, "I do not threaten, kid. I warn and execute sanctions. . . .," and "I am about to teach you that, the hardest way I am capable of . . . I have no mercy on garbage kids like you."). Wooley's threat to kill himself is concerning,[9] but a single texted threat to harm oneself, without more, does not make the trial court's finding of no likely future family violence against the great weight and

---

[9] That is not to say that a suicide threat cannot be considered in support of a protective order. *See, e.g.*, *Dennis v. Rowe*, No. 02-10-00288-CV, 2011 WL 3546618, at *2 (Tex. App.—Fort Worth Aug. 11, 2011, no pet.) (per curiam) (mem. op.). Suicide threats sometimes occur as part of a course of violent conduct, *see, e.g.*, *Turner v. State*, No. 01-17-00563-CR, 2018 WL 5986440, at *4 (Tex. App.—Houston [1st Dist.] Nov. 15, 2018, no pet.) (mem. op., not designated for publication); *Nickelson v. State for Prot. of Nickelson*, No. 04-17-00113-CV, 2018 WL 1831679, at *3 (Tex. App.—San Antonio Apr. 18, 2018, no pet.) (mem. op.), and a person's using threats of suicide to manipulate a romantic partner is a common coercive control tactic and, in a domestic violence or stalking situation, can sometimes be an indicator of a higher risk of violence. *See* Isabell Scott & Nancy McKenna, Domestic Violence Practice and Procedure §§ 1:13, 1:18 (2020); *Power and Control Wheel*, Domestic Abuse Intervention Programs, http://www.theduluthmodel.org/pdf/PowerandControl.pdf (last visited Nov. 23, 2020). Further, threats by a parent to commit suicide may contribute to a finding that the parent engaged in a course of conduct that is detrimental to a child's physical or emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

14

preponderance of the evidence. *See* Tex. Fam. Code Ann. § 71.004 (defining "family violence"). Further, while the fact that Wooley had a romantic relationship with nineteen-year-old Scott while he was her supervisor and continued to pursue a relationship despite acknowledging that he made her uncomfortable[10] raises questions about Wooley's willingness to recognize personal boundaries, it does not mean that the trial court's order must be set aside. *See Ponce v. Diaz*, No. 02-16-00040-CV, 2017 WL 3634064, at *10 (Tex. App.—Fort Worth Aug. 24, 2017, pet. denied) (mem. op. on reh'g) (noting that "[j]ust because [the appellants] theory has support in the evidence does not mean that the jury's verdict should be set aside"). Further, while the trial court was free to draw a negative inference against Wooley for refusing to testify, it was not required to do so.[11] *See State for Prot. of P. B. v. V. T.*, 575 S.W.3d 921, 927 (Tex. App.—Austin 2019, no pet.). Accordingly, deferring as we must to the trial court's determination of Scott's credibility, we cannot say that the trial court's denial

---

[10]We again note that although these texts were referenced by Scott and her mother, they were not admitted at the hearing.

[11]Scott argues that Wooley's failure to take the stand "amounts to an offensive use of the privilege" against self-incrimination. An offensive assertion of a privilege occurs when a plaintiff sues a defendant and then uses a privilege to protect information that is privileged but also essential to the defense. *Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995). "The theory underlying the offensive use line of cases is that a plaintiff who is seeking affirmative relief should not be permitted to maintain the action, and at the same time maintain evidentiary privileges that protect from discovery outcome determinative information not otherwise available to the defendant." *Id.* at 761. Wooley's use of the privilege was not an offensive use.

of the protective order is against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *See Dow Chem.*, 46 S.W.3d at 242. We overrule Scott's third issue.

## CONCLUSION

Having overruled Scott's issues, we affirm.


/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  December 3, 2020